| AUSA: | Stephen Hiyama | Telephone: | (313) 226-9674 |
|---|---|---|---|
| Special Agent: | Brent Nida, FBI | Telephone: | (586) 412-4844 |

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Eastern District of Michigan

United States of America
v.
DELLANIRA R. VALLEJO and
RACHEL L. LAUBACH

Case No.

Case: 2:21−mj−30406
Assigned To : Unassigned
Assign. Date : 8/26/2021
Description: IN RE: U.S. V.
VALLEJO ET. AL. (CMP)(MEV)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __11/2017 to 11/2018__ in the county of __Macomb__ in the __Eastern__ District of __Michigan__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2314, 2(b) | interstate transportation of property > $5,000 stolen, converted, or taken by fraud |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

*Complainant's signature*

Special Agent Brent Nida, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: August 26, 2021

*Judge's signature*

City and state:  Detroit, MI

Kimberly Altman - U.S Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Brent Nida, being duly sworn, state:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of a criminal complaint.

2. I am a Special Agent of the Federal Bureau of Investigation (FBI). I am a "federal law enforcement officer" withing the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure and an "investigative or law enforcement officer . . . of the United States" within the meaning of 18 U.S.C. §§ 2711(1) and 2510(7). I am empowered to conduct investigations of federal crimes and make arrests and conduct searches and seizures in connection with such investigations. *See* 18 U.S.C. §§ 3052, 3107.

3. I have been employed by the FBI as a Special Agent since January 2018. During my employment with the FBI, I have investigated federal crimes, including mail fraud, wire fraud, tax fraud, and other offenses. Prior to being employed by the FBI, I was a police officer for approximately nine years. At all times during the investigation described in this affidavit, I have been acting in an official capacity as a Special Agent of the FBI.

4. The facts in this affidavit come from my personal observations; my training and experience; information obtained from other law enforcement agents, officers, and contractors; information obtained from witnesses; and documents and

other records gathered over the course of this investigation. This affidavit is intended to show only that there is sufficient probable cause for the requested complaint and it does not set forth all of my knowledge about this matter.

5. In light of the facts described below in Paragraphs 6-44, I submit that there is probable cause to believe that DELLANIRA R. VALLEJO and RACHEL L. LAUBACH did transport and cause the transportation in interstate commerce of goods and merchandise having a value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud, in violation of 18 U.S.C. §§ 2314 and 2(b).

## TOTAL LIFE CHANGES, LLC (TLC)

6. In December 2018, Sergeant William Cope (hereafter Sgt. Cope) of the Clay Township Police Department, contacted the FBI in reference to a fraud involving TOTAL LIFE CHANGES, LLC (hereinafter referred to as TLC). Sgt. Cope provided case report 18-9658 and other case related materials to the FBI. Clay Township is located in St. Clair County, in the Eastern District of Michigan.

7. TLC is a company that sells a variety of nutritional products. They sell products including but not limited to weight loss products, nutritional supplements, and vitamins. TLC's headquarters are located at 6094 Corporate Drive, Ira Township, Michigan. Ira Township is located in St. Clair County near Clay

Township. TLC's headquarters include offices and a warehouse where products are stored and from which they are shipped.

8. TLC utilizes a network of independent sales representatives (referred to hereinafter as TLC sales reps) across the U.S. and in multiple countries to sell TLC products. TLC sales reps are not employees of TLC; they are independent contractors paid sales commissions. About 99% of TLC's sales to its customers are made through TLC sales reps. TLC sales reps collect orders from customers and transmit them to TLC either online or over the phone. An order describes the products selected, quantities, and the shipping address, and it includes the credit card number of the TLC sales rep. Customers ordinarily pay TLC sales reps when they place their orders with the sales reps. No TLC employee should personally receive any payment from a sales rep.

9. A few sales are made to customers who buy TLC products directly from TLC. A customer can purchase TLC products at TLC's headquarters in Ira Township and pay for them with cash or a credit card. Or a customer can place an order by telephone and pay for it with a credit card number. No TLC employee should personally receive any payment from a customer.

10. TLC Order Specialists pull batches of orders from TLC's computer system multiple times per day. An order does not show up in a batch unless it was already paid for. Order Specialists determine the best way to ship the orders,

utilizing shipping software, and then they print the shipping labels and packing slips for the orders. TLC uses multiple carriers for shipping, selecting the most efficient and cost-effective method for each shipment. Those carriers include UPS, the U.S. Postal Service, and Landmark Global. TLC Shipping Specialists place the appropriate products in packages or boxes and then place the packages and boxes in a designated pick-up area.

11. With one exception, TLC will not ship an order from its warehouse unless the order has been paid for. The only time an order is not paid for in advance is with manager approval. This occurs when a replacement order is being sent, an incorrect order was sent, or a similar situation.

12. Express orders are shipped directly to TLC sales reps and arrive in one or two business days. Regular orders take about five to seven business days to reach their destinations.

13. TLC employs customer service agents, who handle customer requests and complaints. Level I Customer Service Agents are the initial points of contact. Above them are Level II Customer Service Agents. Their primary responsibilities include assisting Level I Customer Service Agents who have questions or need help satisfying a customer; handling complicated situations and disputes; and dealing with angry customers. Level I Customer Service Agents are typically newer or less experienced employees. Level II Customer Service Agents are more

experienced, are given more discretion, and are regarded as occupying a position of trust within TLC.

14. Level II Customer Service Agents regularly handle situations regarding incorrect shipments and replacement shipments for products that did not arrive. Level II Customer Service Agents have complete access to TLC's warehouse so they can put together replacement orders and corrected orders, or oversee that process, and make sure the packages or boxes get shipped properly.

## TLC'S INTERNAL INVESTIGATION

### *Initial Suspicions*

15. On January 8, 2019, I met with Sgt. Cope and four employees of TLC. The employees present for the meeting were JL, CC, RR, and MC. TLC employee JL stated that there was an ongoing fraud involving two TLC employees, **DELLANIRA R. VALLEJO** and **RACHEL L. LAUBACH**. JL also stated that LAUBACH and VALLEJO were Level II Customer Service Agents during the period in question. They both worked at TLC's headquarters in Ira Township.

16. According to JL, VALLEJO, who goes by the nickname "Della," and LAUBACH were sending product to TLC sales reps that TLC had not been paid for. LAUBACH was sending extra TLC products to TLC sales reps on existing TLC orders. She was also sending TLC products to TLC sales reps and to herself that were not a part of any order. LAUBACH sent TLC products to herself via a post

office box, P.O. Box 173, at a UPS store in Chesterfield Township, Michigan, that she rented. Chesterfield Township is located in Macomb County and is adjacent to Ira Township. TLC employee CC stated that LAUBACH was seen by one of CC's neighbors selling TLC products out of her garage.

17. TLC employee JL stated that TLC was having issues with express orders. A TLC employee responsible for shipping, noticed seven orders in the system after the system had been closed out for the day. After looking at the UPS information, one of the orders appeared legitimate with an invoice and the other six did not appear to be actual orders. As a result, during the week of October 28, 2018, express order responsibilities were temporarily taken away from LAUBACH and VALLEJO. UPS passwords were changed that week, making it so LAUBACH and VALLEJO could no longer enter express orders or any other orders into the UPS system.

18. During the week of November 5, 2018, UPS passwords were given back to LAUBACH and VALLEJO to see if the previous issues were resolved. TLC employee KB offered to closely monitor express orders after LAUBACH and VALLEJO were provided again with access to the UPS system.

### *Three Suspicious Outgoing Packages Containing TLC Product*

19. On November 12, 2018, KB noticed three packages in the warehouse waiting to be shipped that did not make sense. The three packages were researched,

and it was discovered that the product in the packages had not been paid for. The packages were intercepted before they left the TLC warehouse. Earlier, KB noticed that the three packages had been packed by VALLEJO. TLC employee CC confirmed this with security camera footage.

20. TLC employee NP did research on the three packages and other shipments made by LAUBACH and VALLEJO. NP noticed that there were other shipments made by LAUBACH and VALLEJO that were not associated with any orders in the TLC system. The research indicated that LAUBACH and VALLEJO had been sending packages from TLC's warehouse containing product that had not been paid for. The research also found that this had been going on for a long time.

21. TLC employee JL provided documentation for the three packages. Research on these packages was done by TLC employees MC and NP. When an order is received by TLC and entered into TLC's computer system, the system will generate an order number. The TLC order number is used later as the UPS shipment reference number in connection with the shipment by UPS of the products included in the order.

22. The first package intercepted on November 12, 2018, had a UPS shipment reference number of 111218. Accordingly, TLC researchers looked up TLC order no. 111218. According to the TLC invoice for order no. 111218, order no. 111218 was an order placed on January 28, 2017, that was shipped to TLC

sales rep MA in Martinique. The invoice for order no. 111218 stated that the order was for one pack of Iaso Tea (a dietary supplement), worth $44.95.

23. The first intercepted package was addressed to TLC sales rep SP in New Haven, Connecticut. The package was opened as a part of TLC's internal investigation and found to contain 4 packs of Delgada (an instant coffee, $54.95/pack), 2 TLC Pink Insulated Water Bottles ($20.00 each), and 16 bottles of Strike for Men (male sex capsules, $59.95/bottle). The total value of the contents in the package was $1,219.00 and it weighed 6 pounds. The package was to be sent via UPS Next Day Air Saver service. Sales rep SP did not have any orders in the TLC system matching this package. None of this product had been paid for.

24. The second package intercepted on November 12, 2018, had a UPS shipment reference number of 4478875. TLC researchers looked up TLC order no. 4478875. According to the TLC invoice for order no. 4478875, order no. 4478875 was an order placed on November 7, 2018, that was picked up by a TLC sales rep in the Dominican Republic from a TLC facility in the Dominican Republic. The invoice for order no. 4478875 stated that the order was for two 5-packs of Iaso Tea (a dietary supplement), worth $109.90.

25. The second intercepted package was addressed to TLC sales rep NR in Marietta, Georgia. TLC employee JL said that it was common knowledge at TLC that this package was actually being sent to TLC sales rep CF, VALLEJO's mother-

in-law. The TLC sales rep account for NR has been used in the past to send additional product to TLC sales rep CF, and NR's address is also CF's address. The package was opened as a part of TLC's internal investigation and found to contain 24 packs of Instant Iaso Tea, worth $1,438.80. It weighed 19 pounds. The package was to be sent via UPS 3-Day Select service. Neither sales rep NR nor sales rep CF had any orders in the TLC system matching this package. None of this product had been paid for.

26. The third package intercepted on November 12, 2018, had a UPS shipment reference number of 4478795. TLC researchers looked up TLC order no. 4478795. According to the TLC invoice for order no. 4478795, order no. 4478795 was a "replacement order" placed by user DellaniraR (VALLEJO) on November 7, 2018, for one pack of Instant Iaso Tea, worth $59.95. According to TLC's records, this replacement order was not associated with any previous TLC order. TLC replacement orders require manager approval, and there was none here.

27. The third intercepted package was addressed to TLC sales rep NR in Marietta, Georgia. The TLC sales rep account number listed on the TLC invoice belonged to TLC sales rep HP, who had not placed any orders with TLC since September 27, 2018. The package was opened as a part of TLC's internal investigation and found to contain 14 packs of Iaso NRG ($54.95 each), 4 packs of Stem Sense ($59.95 each), 6 packs of HSN-Hair, Skin and Nails ($49.95 each), 2

- 9 -

boxes of Delgada Coffee ($54.95 each), 6 packs of Resolution no. 20 ($59.95 each), 13 packs of Strike for Men ($59.95 each), and 3 packs of Strike Extreme for Men ($0.00 each). The total value of this package was $2,557.75, and it weighed seven pounds. None of this product had been paid for.

28. TLC employee CC provided me with security camera footage from the TLC warehouse that CC believed showed LAUBACH and VALLEJO over-packing existing orders and packing non-existent orders. CC explained that the over-packed product and product tied to non-existent orders would not have been paid for.

### *Interview of Vallejo*

29. On November 13, 2018, the day after the three packages were intercepted, TLC employees JL, CC, and RR interviewed VALLEJO about these matters. All three employees took notes and prepared memoranda of the interview. JL's memorandum related that, at one point, VALLEJO started to cry and stated, "I got the idea from Rachel." (LAUBACH's first name is RACHEL.) JL's memorandum further noted that VALLEJO stated, "This whole thing started because I created a GoFundMe page to raise money for my family and people reached out to me." JL's memorandum also stated that VALLEJO said that LAUBACH taught her how to do this scheme. RR's memorandum reads:

> Misters JL and CC exited the room, leaving Della [VALLEJO] in my sole presence. I asked Della how this could happen, where she explained her financial and emotional plight. Della stated that she was approached by the rep, and the rep's requests began as small favors,

- 10 -

i.e., "put an extra container of product in the order," and escalated from there. Della also stated she would receive an "e-card" as remuneration, or a cash payment at events she would attend.

### Interview of Laubach

30. On the same day, TLC employees JL and CC and another TLC employee, MO, interviewed LAUBACH. JL and CC took notes and prepared memoranda of the interview. JL's memorandum reads, "At one point she began to cry and stated, 'Candace reached out to me and asked me to do it,' [Candace is a TLC sales rep]." JL's memorandum also noted, "[LAUBACH] also stated 'Candace was the only one I did this with,'" and "'Candace reached out to me after a former employee [CB, who was suspected by TLC management as having carried out the same scheme] had quit TLC and left Candace without a source to get free product.'" JL also wrote that LAUBACH stated, "I'm embarrassed" and "I have three kids, what am I going to do?"

### Payments to Vallejo

31. JL also informed me that research was performed on VALLEJO's corporate Gmail account. They observed incoming money transfers from Chase Pay and Square Cash on an almost daily basis. (Chase Pay and Square Cash are payment applications, or pay apps, which enable smart phones to send and receive money with heightened security protections.) The money was coming from various known TLC sales reps, and these payments appeared to coincide with outgoing

- 11 -

packages containing product that had not been paid for. Emails provided to me show that della@totallifechanges.com received payments from Cash App, another pay app.

32. Emails provided to me show that between October 2 and October 24, 2018, VALLEJO received seven payments totaling $3,720 from TLC sales rep SP. According to TLC employee CC, this was just a sample of emails indicating payments to VALLEJO. These payments appear to have been for stolen TLC product she sent to SP. CC advised there were additional emails from TLC sales reps to VALLEJO where the sales reps told VALLEJO what products they wanted and in what quantities. VALLEJO appeared to be getting paid 20% to 30% of retail value, and the sales reps were selling the product at 50% to 60% of retail value.

33. A Grand Jury subpoena was served on JPMorgan Chase Bank for records associated with VALLEJO and LAUBACH. Those records show that Chase Bank account ending in x6588 is a checking account held in the name of DELLANIRA VALLEJO. Records show between March 17, 2016 and November 19, 2018, the account received $59,664.00 in deposits through money services businesses and $59,180.54 in payroll deposits from TLC. The money service business deposits included the following; $23,992.00 from sales associate/mother-in-law CF, $3,521.00 from The George Foster (charity run by CF), $2,862.00 from LAUBACH, $6,492.50 from PayPal, $4,257.13 from Square and $10,926.56 from

VALLEJO's other accounts. After November 23, 2018, the account went negative, the only deposit into the account was $50.00 from LAUBACH on November 30, 2018. The account closed in January 2019 and the bank wrote off a $1,669.33 loss. It is clear the money service business deposits were how VALLEJO was receiving payment for products stolen from TLC.

### *Payments to Laubach*

34. Records of JPMorgan Chase Bank show that Chase Bank account ending in x3988 is a checking account held in the name of RACHEL LAUBACH. Records show between June 24, 2016 and November 19, 2018, the account received $103,017.89 in deposits through money services businesses and $64,792.56 in payroll deposits from TLC. The money services businesses deposits included the following; $74,005.90 from PayPal, $22,196.78 from LAUBACH's PayPal account, $1,932.00 from VALLEJO, $1,596.43 from TLC employee CR and $1,500 from KS on November 15, 2018.

35. Between November 24, 2018 and October 19, 2020, the account received $35,377.63 in deposits from money services businesses. The money services businesses deposits included the following: $12,138.23 in PayPal deposits, $10,894.12 in Cash App deposits, $6,000.00 from KS and $1,863.12 from LAUBACH different accounts. The account also received $183.43 in payroll from TLC. Records show between September 13, 2018 and November 13, 2018, there

were 38 PayPal deposits into the account. Between November 14, 2018 and January 14, 2019, there were zero PayPal deposits into the account. It is evident that LAUBACH was using PayPal to receive payments for products stolen from TLC, her last day working at TLC was November 13, 2018.

### *Laubach's Post Office Box*

36. Records provided by TLC show that a number of packages were sent to a post office box 173 at a UPS Store in Chesterfield Township, Michigan. Sgt. Cope obtained records of that UPS Store pursuant to a state search warrant. The records produced show that LAUBACH was renting box 173; her Michigan Driver's License was photographed when she signed the lease for box 173. LAUBACH also signed for packages that were sent to box 173. Records provided by TLC for shipments to box 173, match up with documentation from the UPS store that indicate when LAUBACH signed for packages. TLC records show that no product tied to legitimate TLC orders were sent by TLC to box 173. They also reflect that no payments for product sent to box 173 were ever received by TLC.

### *Connecting Unpaid TLC Orders to Vallejo and Laubach*

37. I was told that TLC employee NP did most of the research on orders placed with TLC through Exigo, the software used by TLC to record and track orders, and that TLC employee MC did most of the research on UPS shipping activity.

38. NP told me that he/she focused on identifying TLC orders that could be tied to either LAUBACH or VALLEJO. NP looked into orders for which the TLC order number was out of sequence. TLC order numbers are generated automatically by Exigo in sequential order. These numbers are 6 or 7 digits long. NP found that the TLC order numbers that were out of sequence were actual order numbers that had been generated and used in the past for legitimate orders. For example, NP identified order no. 4124082, placed on or about July 3, 2018, as one that was out of sequence. NP found the original order no. 4124082, which, according to the TLC invoice for that order, was an order placed on or about June 11, 2018, for product that had been shipped to a TLC sales rep in France and paid for. No TLC invoice is created for an order using an order number that has been previously used, and so no TLC invoice was created for the order placed on or about July 3, 2018. But UPS and TLC records show that that order resulted in the shipment of product to a TLC sales rep in North Carolina, AG, that has not been paid for.

39. NP also looked into order numbers that were not in the proper TLC format. As noted above, the proper format is a number made up of 6 or 7 numerals. TLC order numbers did not include any letters. When an order is received by TLC and entered into TLC's computer system, the system will generate an order number. The TLC order number is used later as the UPS

shipment reference number in connection with the shipment by UPS of the products included in the order. Thus, MC and NP concluded that orders were suspicious if the UPS shipment reference number included letters, such as "Della5/16/18" and "Rachel12272017."

40. TLC employees JL, CC, NP, and MC were able to determine who was responsible for specific shipments out of TLC's warehouse based on UPS shipping information, UPS login credentials, order number patterns, created order numbers, security camera footage, Exigo order information, and their knowledge about the personal relationships that VALLEJO and LAUBACH had with TLC sales reps.

41. NP advised LAUBACH typically used UPS ground for her fraudulent shipments and VALLEJO typically used some sort of UPS expedited shipping.

### *Estimated Value of TLC Orders Not Paid For*

42. NP also noticed that shipments associated with original TLC order numbers tended to weigh about one pound. Subsequent shipments using the same order numbers for the second time tended to weigh much more. The exact contents of the subsequent shipments could not be determined because, as noted above in Paragraph 38, no TLC invoice is created for an order using an order number that has been previously used. As a result, I have made rough approximations of the value of the subsequent shipments, extrapolating from the weight and value of the contents of the three outgoing packages intercepted by TLC personnel on

November 12, 2018, described above in Paragraphs 19-28. The three packages weighed a total of 30 pounds and contained TLC product whose prices totaled $5,215.55. Thus, the price per pound of the product in the three packages was $173.85. This figure, $173.85, was used as a rough estimate of the value of one pound of unpaid-for shipments, and the figures in the "estimated loss" columns are based on a value of $173.85 per pound of product.

### SUMMARY OF FINDINGS OF TLC INTERNAL INVESTIGATION

43. I was provided with a number of records and information generated during TLC's internal investigation. I prepared the tables below using those records, which reflect shipments of TLC product that had not been paid for that can be tied to VALLEJO or LAUBACH or both of them:

**Unpaid-for Shipments Connected to Vallejo**

| Sales Rep to Whom Shipments Were Sent | Number of Shipments | Total Weight of Shipments | First Shipment Located | Shipping Costs | Estimated Loss |
|---|---|---|---|---|---|
| CF | 289 | 3,404 lbs. | 12/01/2017 | $ 3,574.92 | $591,785.40 |
| PE | 48 | 379 lbs. | 12/19/2017 | $ 4,218.81 | $ 65,889.15 |
| SP | 23 | 221 lbs. | 11/28/2017 | $ 1,351.87 | $ 38,420.85 |
| AG | 8 | 102 lbs. | 07/03/2018 | $ 980.22 | $ 17,732.70 |
| JS | 4 | 37 lbs. | 08/21/2018 | $ 297.73 | $ 6,432.45 |
| NR (also CF) | 3 | 24 lbs. | 10/31/2018 | $ 130.10 | $ 4,172.40 |
| DS | 9 | 20 lbs. | 12/20/2017 | $ 241.30 | $ 3,477.00 |
| BB | 1 | 15 lbs. | 10/26/2018 | $ 28.77 | $ 2,607.75 |
| EM | 2 | 15 lbs. | 07/10/2018 | $ 216.62 | $ 2,607.75 |
|  | 387 | 4,217 lbs. |  | $11,040.34 | **$733,125.45** |

**Unpaid-for Shipments Connected to Laubach**

| Sales Rep to Whom Shipments Were Sent | Number of Shipments | Total Weight of Shipments | First Shipment Located | Shipping Costs | Estimated Loss |
|---|---|---|---|---|---|
| CD | 59 | 667.5 lbs. | 11/17/2017 | $ 1,144.09 | $116,044.88 |
| CT | 10 | 286.0 lbs. | 03/06/2018 | $ 1,962.71 | $ 49,721.10 |
| Healthy 2 You | 8 | 68.0 lbs. | 09/12/2018 | $ 86.10 | $ 11,821.80 |
|  | 77 | 1,021.5 lbs. |  | $ 3,192.90 | **$177,587.78** |

**Unpaid-for Shipments Connected to Vallejo or Laubach**

| Sales Rep to Whom Shipments Were Sent | Number of Shipments | Total Weight of Shipments | First Shipment Located | Shipping Costs | Estimated Loss |
|---|---|---|---|---|---|
| multiple | 20 | 222 lbs. | 09/06/2018 | $ 1,954.01 | **$ 38,594.70** |

"First shipment located" refers to the first unpaid for shipment sent to a TLC sales rep.

## INTERSTATE NEXUS

44. Most of the shipments of unpaid-for product that had been set in motion by VALLEJO and LAUBACH were sent from the TLC warehouse in Ira Township, Michigan, to destinations outside of Michigan. VALLEJO sent shipments of unpaid-for TLC product, or caused such shipments to be made, to TLC sales rep CF in Georgia, to TLC sales rep PE in Georgia, to TLC sales rep SP in Connecticut, to TLC sales rep AG in North Carolina, to TLC sales rep JS in Ohio, to TLC sales rep NR in Georgia, to TLC sales rep DS in Georgia, to TLC sales rep BB in Georgia, and to TLC sales rep EM in Georgia. LAUBACH sent shipments of unpaid-for TLC product, or caused such shipments to be made, to TLC sales rep CD in

Pennsylvania and to TLC sales rep CT in California. There were additional out-of-state shipments of unpaid-for TLC product attributable to VALLEJO and LAUBACH.

### CONCLUSION

45. In light of the evidence described above, I submit that there is probable cause to believe that, from no later than November 2017 to approximately November 2018, in the Eastern District of Michigan and elsewhere, **DELLANIRA R. VALLEJO** and **RACHEL L. LAUBACH** did transport and cause the transportation in interstate commerce of goods and merchandise having a value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud, in violation of 18 U.S.C. §§ 2314 and 2(b).

_____
Brent Nida,
Special Agent, FBI

Sworn to before me and signed in my presence and/or by reliable electronic means.

_____
KIMBERLY ALTMAN
United States Magistrate Judge

Dated: August 26, 2021